**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Task Force Officer Matthew Harnish, being first duly sworn, hereby depose and state as follows:

1.      I am a Dover Police Detective assigned to the New Hampshire Safe Streets Gang Task Force ("NHSSGTF") with the Federal Bureau of Investigation ("FBI") serving in the capacity of a Task Force Officer ("TFO").  I have been assigned to the FBI since April of 2019. From 2013 until 2019, I was assigned to the Uniformed Patrol Division at the Dover, New Hampshire Police Department. From 2016 until the present, I have been assigned to the Strafford County Regional Tactical Operations Unit. In April of 2019 I was assigned to the Dover Police Department's Special Investigations Unit, more specifically assigned to the New Hampshire Safe Streets Gang Task Force, Federal Bureau of Investigation Boston Division.

2.      Over the course of my employment as a Dover Police Officer/Detective and FBI Task Force Officer, I have conducted and participated in hundreds of criminal investigations which have resulted in arrests for crimes involving controlled substance violations, firearms violations, home invasion, larceny, assault and battery with a dangerous weapon, breaking and entering, and armed robbery.

3.      I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as collection, expenditure, accounting, transportation and laundering of drug proceeds. I have participated in debriefing numerous defendants, informants, and witnesses who had personal

1

knowledge regarding narcotics trafficking organizations.  I have participated in all aspects of drug investigations including surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests.  I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

4.     During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies. In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducting short-term and long-term narcotics investigations, consensual monitoring and recording of both telephonic and non-telephonic communications, conducting controlled drug purchases, and preparing and executing search warrants that resulted in seizures of narcotics, firearms, and other contraband.

5.     The following affidavit is furnished to support a search warrant for the residence located at 3 Regent Drive, Apartment 316, Dover, New Hampshire ("the Regent Drive Residence"). A detailed property description is contained in Attachment A.

6.     Based on the facts and circumstances contained in this affidavit, I submit that there is probable cause to believe that Glenn Brill ("Brill") and Dawson Boston ("Boston") and others known and unknown are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances). I submit that there is probable cause to support the issuance of a search warrant for the specified location which, investigators believe, will yield evidence of criminal activity, contraband, and fruits and instrumentalities of these crimes.

7.     The information in this affidavit is based in part on information supplied by a confidential source ("CS #1"). CS #1 has convictions for burglary, assault, failure to appear, theft, and unsworn falsification. He/she has a history of involvement with a violent street gang. CS #1 previously cooperated with the FBI, but was terminated as a cooperator because of a domestic violence incident. According to CS #1, part of the reason he/she stopped cooperating at that time was because of his/her drug use and because of issues relating to a significant other, apparently referring to the domestic violence incident. When CS #1 was released from a recent prison sentence, he/she contacted the FBI about cooperating in exchange for money. Once during his/her recent cooperation, he/she was stopped for driving without a license but he/she has since resolved that ticket. The FBI provided CS #1 with some money to help get his/her license reinstated. Since cooperating with the FBI recently, CS #1 has been compensated with approximately $7,000. Over the summer of 2019, CS #1 got in an altercation with a family member who accused him/her of stealing a credit card. Although the family member has since dropped the charges, we have not used CS #1 to cooperate since that time. CS #1's information about this case has consistently been reliable and I have corroborated it with surveillance observations and other sources.

8.     CS #2 was a target of an FBI investigation for selling heroin/fentanyl in the Seacoast area. Investigators suspected that he/she was selling between 200 and 300 grams of fentanyl every few days. Some of his/her associates were arrested in the Spring of 2019 and CS #2 approached the FBI, apparently afraid that he/she was being targeted as well and asked to cooperate. CS #2 is cooperating with law enforcement officers in hopes of not facing charges for his/her drug trafficking and has been compensated with approximately $9,000. His/her cooperation has resulted in the arrests of at least three people and has led to substantial seizures

of narcotics. He/she continues to assist in other investigations. He/she has convictions for simple assault, willful concealment, false report, burglary, second degree assault, theft by unauthorized taking, resisting arrest, violation of probation, false information to law enforcement, felonious sexual assault, simple assault, 2nd degree assault, resisting arrest, reckless conduct, and conduct after an accident. I have corroborated CS #2's information and found it to be reliable.

9.      As part of this investigation, officers conducted various controlled purchases of drugs using CS #1 and CS #2. Before and after each deal, CS #1 and CS #2 were thoroughly searched for drugs, money, or other contraband with negative results. They were provided audio/video recording devices whenever possible and kept under close law enforcement surveillance.

10.     In February of 2019, Boston was stopped by the New Hampshire State Police as a passenger in a vehicle. He provided telephone (603) 923-1260 as his contact number ("the 1260 Phone"). In March of 2019, officers met with CS #1 who told them that Boston was supplying heroin/fentanyl to the Seacoast area in New Hampshire (specifically Dover, Somersworth and Rochester) and uses runners to deliver his drugs. According to CS #1, Boston told him/her this information because they knew each other socially. At one point, Boston agreed to sell CS #1 heroin/fentanyl. CS #1 provided law enforcement officers with the 1260 Phone as the phone he/she uses to contact Boston.

11.     On April 9, 2019, CS #1 contacted Boston by text on the 1260 Phone and asked to buy six "whole" meaning 60 grams of fentanyl. During a conversation with Boston (on a different telephone, known by CS #1 to be used by an associate of Boston's), Boston described his product as "fire" and "raw," discussed his other customers, his supplier, and how he sends

back dope if it isn't of good enough quality. Boston said that he would have "his guy" contact CS #1 about a drug sale.

12.     A man later identified as Brill then contacted CS #1 using telephone number (603) 923-1934 ("the 1934 Phone") and they planned to meet near Brill's residence, outside the Regent Drive Residence. Brill got in the car, introduced himself as "Ricky" and they discussed the quantity of drugs. The conversation was audio recorded. Brill said he switched his phone number frequently. Brill subsequently sold CS #1 what lab results confirmed to contain 37 grams of a mixture of heroin and fentanyl. After Brill got out of the car, law enforcement agents took a clear photo of his face. They were able to compare this to photographs of Brill from recent arrests and law enforcement officers familiar with Brill confirmed that it was him. Also, Brill has a registered address at the Regent Drive Residence.

13.     On April 15 and April 16, 2019, CS #1 arranged another purchase through text message with Boston.  Over the messages, he/she discussed prices and quality of drugs. Boston again directed him to "Ricky" (identified as Brill). Over text messages with Brill, the CS wrote "I thought Dawson said 200" as the price per finger. They discussed the price and Brill responded, "Don't say his name over text either" apparently referring to Boston. The deal was planned for April 16, 2019. During the video recorded meeting, CS#1 got in the car and exchanged $1780 for a bag containing approximately 70 grams of heroin/fentanyl. The two drove around the block and the CS asked Brill for a "tool for protection." Brill responded he could get him a "40 for 300" which I believe to refer to a .40 caliber firearm. Brill said that he had bullets as well but wouldn't sell the ammunition because he bought it in his own name. He said he could get the gun to CS #1 at any time. They discussed "Dawson" in the car as well. The

recording clearly shows Brill's face. Lab results confirmed that CS #1 purchased approximately 70.1 grams of a mixture of heroin and fentanyl.

14.     On April 18, 2019, CS #1 contacted Boston and asked to purchase another 20 grams for $500. He/she then reached out to Brill and confirmed the order of 20 grams and asked about the previously-discussed firearm. Brill confirmed he could get it for him/her. CS #1 picked up Brill near the Regent Drive Residence, and Brill handed CS #1 the drugs and firearm and ammunition in a plastic bag. The CS then returned Brill to the parking lot of the Regent Drive Residence. After the deal, the CS turned over a Smith & Wesson handgun, serial number HEW1928, fourteen .40 caliber rounds, and what lab results confirmed to be approximately 20.2 grams of a mixture and substance containing heroin and fentanyl to officers.

15.     On or about May 5, 2019, CS #1 called Boston (on the 1260 Phone) and attempted to set up a purchase of 110 grams of fentanyl. Boston negotiated pricing with him (settling on $275 a finger). Boston told the CS he would meet "Chris" to get the drugs and they planned the deal for May 7, 2019.

16.     On May 7, 2019, Boston, using the 1260 Phone, texted CS #1 the telephone number for someone he referred to as "Blizzy" who would meet CS #1 to sell him drugs. The CS called Blizzy from New Hampshire and Blizzy told the CS to meet him at an address in Berwick, Maine. When he arrived, Blizzy got in the front passenger's seat of the car with a black backpack. He opened the backpack and showed the CS a package wrapped in black tape. The CS drove Blizzy to a nearby convenience store, gave him $1,000 and dropped him off. Lab results confirmed that the package contained approximately 109.9 grams of fentanyl.

17.     On May 16, 2019, CS #1 attempted to conduct a purchase with Boston, but Boston was unavailable. Over various days, Boston used the 1260 Phone to text and call CS #1

asking to collect additional money CS #1 owed him from the drugs sold by "Blizzy" on May 7, 2019.

18.     On May 20, 2019, the CS attempted to return the money to Boston, who refused to meet him directly, saying, "I got people who do this shit for me." The CS attempted to buy drugs from Boston that day as well, but Boston said he was out of drugs to sell. Eventually, the CS met up with Brill (clearly visible on video) and provided him the money owed to Boston. CS #1 drove Brill around as Brill counted the money.

19.     Agents met with CS #2 over the summer of 2019. Although CS #2  had never purchased drugs from Boston or his associates before, he/she knew of them because they ran in similar social circles. At the direction of the FBI, CS #2 introduced himself to Boston and asked if he/she could start buying drugs from him. Boston provided CS #2 with the 1260 Phone as his personal number. On July 9, 2019, CS #2 contacted Boston over the 1260 Phone and placed an order for 100 grams of heroin/fentanyl for $2,750. Boston directed him to go to the Regent Drive Residence. When CS #2 arrived, Boston met him near the entrance to building 3, and CS #2 followed Boston into apartment 316, which the CS reported was the last door on the left on the first floor of the apartment building. Boston used a scale to weigh the drugs and then provided CS #2 with a baggy containing a white powdery substance. This deal was video recorded and Boston's face is clearly visible on the recording. While CS #2 was in the apartment, Brill walked out of another room. During conversation between the three, Brill and Boston discussed sharing the rent.  CS #2 provided the suspected drugs to law enforcement officers after the purchase. Although lab results have not yet been received, I believe, based on my training and experience, that the substance is consistent with the color, texture and packaging of heroin and/or fentanyl.

20.     On July 29, 2019, CS #2 conducted a second controlled buy from Boston. CS #2 contacted Boston on the 1260 Phone and placed an order for 150 grams of heroin/fentanyl. CS #2 was directed to pick up Brill and Boston near an address in Rochester, New Hampshire. Once they were in the car, they directed CS #2 to drive them back to the Regent Drive Residence, where all three went inside apartment 316. Both Brill and Boston were present while Boston weighed the drugs on a scale. CS #2 provided Boston with $4,000 in exchange for a bag containing a white powdery substance. Boston also provided CS #2 with a sample of what he described as a stronger sample of drugs, which he called "fire." This conversation was captured on the video recording device. CS #2 provided the suspected drugs to law enforcement officers after the purchase. Although lab results have not yet been received, I believe, based on my training and experience, that the substance is consistent with the color, texture and packaging of heroin and/or fentanyl.

Training and Experience Concerning Items to be Seized

21.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency. Based on my training and experience, powder drugs such as heroin and fentanyl are generally brought into the region in bulk. However, such drugs are not typically consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High

purity powder drugs are reduced in purity by the addition of dilutants. This process is called

"cutting" or "stepping on" the drug. Other equipment, such as scales, grinders, razor blades, glass

panes, blenders, and mirrors, and the like are typically used in this cutting process. Once the drug

has been "cut," a usual practice is to repackage it in smaller quantities in heat-sealed and/or other

types of plastic bags for redistribution.

22.     It is generally a common practice for drug traffickers to maintain in hard copy or

on computers or other electronic devices, records relating to their drug trafficking activities.

Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled

substances to their clients, or alternatively, will be "fronted" controlled substances from their

suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such

records will also be maintained close at hand so as to readily ascertain current balances.

23.     Drug traffickers will commonly maintain records and documents which provide a

paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual

transactions. There are many reasons why an individual will generally maintain records for long

periods of time. One reason is that the records will often seem innocuous because of their nature

(e.g. financial, credit card and banking documents, travel documents, receipts, client lists,

documents reflecting purchases of assets, personal calendars, telephone and address directories,

check books, videotapes and photographs, utility records, ownership records, letters and notes,

tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes,

packaging materials, computer hardware and software). Second, the individual may no longer

realize he/she still possesses the records or may believe law enforcement could not obtain a

search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store

such records, and because they generally have no immediate need for the records, they are often

forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

24.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

25.     It is also a generally common practice for traffickers to conceal at their residences or other places they access frequently large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences. Boston once asked CS #2 to

send him drug-related money to his Bank of America account. Therefore, I believe that financial documents may provide evidence of drug trafficking and sources of income.

26.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

27.     They may also maintain surveillance systems of their residences. Surveillance systems may capture evidence of meetings between distributors and customers and/or conspirators, shipments of drugs, or other meetings relevant to drug transactions.

28.     Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Brill once sold a firearm to CS #1 directly after leaving the target residence.

29.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a residence or on an individual's person.

30.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones or computers. For example, I have seen social media photographs of these targets and their associates with money and firearms.

31.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

<u>Training and Experience on Digital Devices</u>

32.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

33.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In addition, some members of this drug trafficking organization frequently discussed communicating with each other over social media platforms. CS #1 told officers that he/she sometimes communicated with Boston over Facebook Messenger.

34.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.

35.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. I believe that the targets of this investigation likely use smartphones because they often discuss communicating over social media applications that are commonly found on smartphones (like Facebook), taking videos, and sharing photographs. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

36.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

    a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

    b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is

the equivalent of 500,000 double-spaced pages of text.  Storage devices capable

of storing 500 or more gigabytes are now commonplace.  Consequently, just one

device might contain the equivalent of 250 million pages of data, which, if printed

out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a

500 gigabyte drive could contain as many as approximately 450 full run movies

or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years

after they have been downloaded onto a hard drive, deleted, or viewed via the

Internet.  Electronic files saved to a hard drive can be stored for years with little

or no cost.  Even when such files have been deleted, they can be recovered

months or years later using readily-available forensics tools.  Normally, when a

person deletes a file on a computer, the data contained in the file does not actually

disappear; rather, that data remains on the hard drive until it is overwritten by new

data.  Therefore, deleted files, or remnants of deleted files, may reside in free

space or slack space, i.e., space on a hard drive that is not allocated to an active

file or that is unused after a file has been allocated to a set block of storage space,

for long periods of time before they are overwritten.  In addition, a computer's

operating system may also keep a record of deleted data in a swap or recovery

file.  Similarly, files that have been viewed on the Internet are often automatically

downloaded into a temporary directory or cache.  The browser typically maintains

a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently downloaded or viewed

content.  Thus, the ability to retrieve residue of an electronic file from a hard drive

depends less on when the file was downloaded or viewed than on a particular

user's operating system, storage capacity, and computer habits. Recovery of

residue of electronic files from a hard drive requires specialized tools and a

controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the

form of user-generated documents (such as word processing, picture, and movie

files), digital devices can contain other forms of electronic evidence as well. In

particular, records of how a digital device has been used, what it has been used

for, who has used it, and who has been responsible for creating or maintaining

records, documents, programs, applications and materials contained on the digital

devices are, as described further in the attachments, called for by this warrant.

Those records will not always be found in digital data that is neatly segregable

from the hard drive image as a whole. Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard

drive but has since been deleted or edited, or of a deleted portion of a file (such as

a paragraph that has been deleted from a word processing file). Virtual memory

paging systems can leave digital data on the hard drive that show what tasks and

processes on the computer were recently used. Web browsers, e-mail programs,

and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords. Operating systems can

record additional data, such as the attachment of peripherals, the attachment of

USB flash storage devices, and the times the computer was in use. Computer file

systems can record data about the dates files were created and the sequence in

which they were created.  This data can be evidence of a crime, indicate the

identity of the user of the digital device, or point toward the existence of evidence

in other locations.  Recovery of this data requires specialized tools and a

controlled laboratory environment, and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for,

and who has used it, may be the absence of particular data on a digital device.

For example, to rebut a claim that the owner of a digital device was not

responsible for a particular use because the device was being controlled remotely

by malicious software, it may be necessary to show that malicious software that

allows someone else to control the digital device remotely is not present on the

digital device.  Evidence of the absence of particular data on a digital device is not

segregable from the digital device.  Analysis of the digital device as a whole to

demonstrate the absence of particular data requires specialized tools and a

controlled laboratory environment, and can require substantial time.

<u>Conclusion</u>

37.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of Title 21, United States Code, Sections 841(a)(1) and 846 will be found by searching the location described in Attachment A. Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by Boston, Brill, and others.

I declare that the foregoing is true and correct.

/s/ Matthew Harnish
MATTHEW HARNISH
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me this 13th day of August, 2019.

HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

**ATTACHMENT A**

**3 Regent Drive, Apartment #316, Dover, NH 03820**

This search warrant authorizes the search of the premises described as a first floor unit, Apartment #316, of a multi-unit apartment building, Building #3, and any common areas of 3 Regent Drive, Dover, New Hampshire, including all safes, containers, and enclosures therein. The apartment building located at 3 Regent Drive is a three floored multi-unit apartment building with light gray siding and white trim.  Building #3 is clearly marked with a green sign on the right hand side of the building, reading, "311-336 REGENT DR, BUILDING #3."  The first floor residence, Apartment #316, is primarily accessed via a white, double-door common entryway for the building in the center of the first floor.  This door is adjacent to a large parking lot for residents of Building #3 as well as those of other buildings in the complex.  The double-door common entryway runs straight through the center of the building to another double-door common entry/exit door.  Apartment #316 is a first floor apartment accessed via the hallway connecting both common entry/exit points for the building.  The apartment is at the end of the hall on the left hand side of the building, furthest away from the main double-door entry point. Apartment #316 has a white door with the sticker markings, "31," on the middle of the door, and it appears the "6" either fell off or was removed from the door.



**ATTACHMENT B**
**Regent Drive Apartment**

1.    Controlled substances including, but not limited to heroin and fentanyl;

2.    Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.    Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors and devices used to store surveillance footage, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

4.    Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic / digital media) and objects capable of storing financial digital data;

5.    Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.    Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.    Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2017 to the present;

8.    Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, jewelry, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.    Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10.   Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.   Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12.   Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

13.   Keys to show ownership for storage facilities, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

14.   Cellular telephones including the cellular telephone assigned call number 603-923-1260 used by BOSTON and 603-923-1934 used by BRILL. I seek to search that telephone for:

   a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

g.  all bank records, checks, credit card bills, account information, and other financial records; and

h.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

I seek authority to seize other telephones in the residence that are believed to be used by these targets or co-conspirators but will seek further authority before conducting searches of those devices. Investigators will not seize cellular telephones determined to belong to third parties who may be present in the residence but who are not co-conspirators. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.